[No. 8680.   Department One.   August 6, 1910.]

*In the Matter of the Guardianship of* NELS OSCAR SALL.[1]

INSANE PERSONS—GUARDIANS—APPOINTMENT.   A guardian may be appointed of the estate of one who, following an accident, suffered a nervous shock and ill health, seemed to have forgotten his own identity, and displayed marked symptoms of mental alienation and suddenly disappeared, since which nothing had been heard of him after diligent search for over a year (RUDKIN, C. J., dissenting).

SAME—JURISDICTION TO APPOINT GUARDIAN—STATUTES—CONSTRUCTION—COURTS—INHERENT POWERS.   Construing as a whole the act of 1909 (Rem. & Bal. Code, § 1622 *et seq.*), providing in the first section that the superior court may appoint a guardian of the local estate of an insane person resident in the county, and in section 4, that if the insane person resides out of the state of Washington, service may be had by publication, the court is given jurisdiction to appoint a guardian of the local estate of a nonresident insane person; especially in view of the inherent chancery powers of the court to protect the estates of nonresident incompetent persons, the statute being merely cumulative and concurrent.

SAME.   Const., art. 4, § 6, conferring universal original jurisdiction upon the superior court in all special cases and proceedings not otherwise provided for, is sufficiently broad to embrace general chancery jurisdiction to appoint guardians of the local estate of nonresident insane persons.

SAME—JURISDICTION TO APPOINT GUARDIAN—DOMICILE.   The jurisdiction of the superior court to appoint a guardian of the local estate of an insane person does not depend upon his domicile, but the appointment may be made when his whereabouts is unknown.

SAME—APPOINTMENT OF NONRESIDENT.   Under Rem. & Bal. Code, § 1622, providing no residential qualifications, the superior court may appoint a nonresident guardian of the local estate of a nonresident insane person.

INSANE PERSONS—GUARDIANS—JURISDICTION OF PROPERTY.   Jurisdiction to appoint a guardian for the estate of a nonresident insane person is limited to property within this state.

Appeal from an order of the superior court for King county, Main, J., entered August 19, 1909, appointing a guardian for the estate of a nonresident incompetent person, after a hearing before the court.   Affirmed.

[1]Reported in 110 Pac. 32; 626.

*James J. McCafferty*, for appellant.

*Samuel Morrison* and *Charles Loring*, for respondent.

CHADWICK, J.—Charles G. Sall, a resident of the state of Minnesota, filed his petition under chapter 118 of the Laws of 1909, page 408 (Rem. & Bal. Code, § 1622 *et seq.*), praying that he be appointed guardian of the estate of his brother, Nels Oscar Sall, whom he alleged to be an incompetent person. At the time of the application, Nels Oscar Sall was of the age of forty-five years. For several years he had been a resident of the territory of Alaska, where he with two others discovered a group of mining claims in the year 1907. In December of that year the claims were bonded to James J. Godfrey, who resists the petition for guardianship. By the terms of the option agreement, a certain sum was paid down and a deed was executed and placed in escrow at the Puget Sound National Bank, which bank was made the agent of all parties to the escrow agreement, with power to receive the deferred payments, and upon final payment to surrender the deed. In November, 1909, when these proceedings were commenced, there was $1,985 of the moneys coming to Nels Oscar Sall and paid under the option on deposit in the Puget Sound National Bank and subject to his check.

Prior to April, 1908, Nels Oscar Sall had been a man of usual mental strength, but in that month, while with a sled and team upon the Chitna river in Alaska, the ice broke, precipitating the team and sled and Mr. Sall into the waters of the river. He floated under the ice for a distance of about seventy feet, when he was rescued by his companions. He suffered an immediate shock to his nervous system. Thereafter he was in ill health, and it was noticed that his conduct and demeanor toward others was not as it had formerly been. He was taken to the hospital at Valdez, from whence, after some weeks' treatment, he suddenly disappeared, and was afterwards found by the United States marshal's office acting through the intervention of Senator Nelson of Minne-

sota.  When found he was working in a railroad camp at
Cordova.  He seemed to have forgotten his name; at any rate
he was working under an assumed name, and there is evidence
tending to show that he at times lost the faculty of remember-
ing his own identity.  At the railroad camp he is said to have
.displayed almost superhuman strength, a condition not un-
usual in those of failing mentality, and in some cases a marked
symptom of mental alienation.  Thereafter he came to Seat-
tle, where several of his former friends met and conversed
with him.  While they were not willing to say that he is not
capable of attending to his own business, they all agree that
they would not trust him to attend to business of any kind
for them.  The opinion is expressed that he was "batty," or
"off his nut," and it is shown that, contrary to his former
disposition, he was silent, melancholy, and morose; that when
spoken to he would answer questions sullenly, almost in-
solently.  There is evidence to show that he was afraid of
losing his money and dying poor, and that the banks were
unsafe; and while at the hotel, the clerk says that "he would
walk around; walk to his room six or seven times in ten
minutes."  In November, 1908, he disappeared from the
Diller hotel, and has not since been seen or heard of, al-
though search has been made in Alaska, Seattle, Tacoma,
Portland, and other places.  These are the facts which moved
the court to appoint Charles E. Sall guardian of the estate
of his brother, and are sufficient, in the judgment of this
court, if the law does not intervene to prevent it.

Mr. Godfrey has appealed, assigning as error that the
superior court had no jurisdiction to appoint a guardian for
a nonresident, or one not within the jurisdiction of the court.
It will be observed that chapter 118, Laws of 1909, page 408
(Rem. & Bal. Code, § 1622 *et seq.*), refers only to property,
and has nothing whatever to do with the guardianship of the
persons of the classes referred to therein.  It provides in
§ 1 that a petition shall be filed showing, not only that the
incompetent person has property needing care and attention,

but that the owner is a resident of the county where the petition is filed. Section 4 of the act provides that, where the incompetent person resides out of the state of Washington and has property within said state requiring the care of a guardian, and a petition is filed in the county where such incompetent has property, service by publication may be had.

It is contended that § 1 defines the jurisdiction of the court, and that § 4 cannot be given effect unless it is also made to appear that the incompetent is, in fact, domiciled in the county. If this effect is given to the statute, we think, unquestionably, that the contentions of the appellant should prevail. But, construing the act as a whole, and recognizing the necessity as well as the duty of the state to protect the estates of incompetent persons, the construction put upon the statute by appellant may well be doubted. A careful examination of the law on our own account convinces us that the superior courts have an inherent jurisdiction to protect estates of nonresident, incompetent persons; and that, while it is generally said that the power to appoint guardians is purely statutory, the power in fact lies in the sovereignty of the state, and the procedure only is statutory. In England, from whence we have derived our common law and the accepted heads of equity jurisdiction, the king assumed the care of insane persons and their property *in parens patriae*. After a declaration or finding of insanity, the jurisdiction in lunacy cases was held in some early cases to be no longer exercisable under the king's sign manual, but in virtue of the general powers of the court. *Ex parte Grimstone*, 2 Amb. 706; *Burford v. Lenthall*, 2 Atk. 551; *In re Fitzgerald*, 1 Ll. & G. t. P. 20, 2 Sch. & Lef. 439.

Mr. Woerner, in his work on the American Law of Guardianship, § 18, says that it is the prevalent conviction of lawyers, judges, and text-writers in America that, in the absence of countervailing statutes, American courts having equity powers possess a general jurisdiction for the appointment of guardians. Story draws no distinction between the powers of

American and English courts in this respect; Story's Eq. Jur., ch. 35; and Mr. Pomeroy, in his Equity Jurisprudence, at § 1306, says that American courts have this power in so far as it has not been taken away by statute. It is, therefore, held that, where the power to appoint guardians has been conferred upon other courts, as, for instance, the probate court of the territory before the creation of the state of Washington, the power is cumulative and concurrent with the court of chancery. *Lee v. Lee,* 55 Ala. 590; *Wilson v. Roach,* 4 Cal. 362; *Ex parte Miller,* 109 Cal. 643, 42 Pac. 428; *Board of Children's Guardians v. Shutter,* 139 Ind. 268, 34 N. E. 665, 31 L. R. A. 740; *Corrie's Case,* 2 Bland. (Md. Ch.) 488; *Wilcox v. Wilcox,* 14 N. Y. 575; *Durrett v. Davis,* 24 Gratt. (Va.) 302; *Glasscott v. Warner,* 20 Wis. *654; *Harlin v. Stevenson,* 30 Iowa 371; *Sterritt v. Robinson,* 17 Iowa 61.

It would follow, then, that the statute, in declaring that the court might appoint a guardian for the property of an incompetent person resident of the county, would not bar a court of general jurisdiction of its general equity powers, provided the constitution is broad enough to warrant its exercise. That the superior court of this state has such general jurisdiction has been frequently declared. In *Moore v. Perrott,* 2 Wash. 1, 25 Pac. 906, it is said:

"The language of the constitution [art. 4, § 6,] is not that the superior courts shall have exclusive jurisdiction, but it gives to the superior courts universal original jurisdiction, leaving the legislature to carve out from that jurisdiction the jurisdiction of the justices of the peace, and any other inferior courts that may be created."

In *Krieschel v. Board of Comr's., Snohomish County,* 12 Wash. 428, 41 Pac. 186, it was said of the same provision:

"The language there used is certainly very broad and comprehensive, and might well be said to apply to cases of this character, as they are 'not otherwise provided for,' and, if contemplated at all, fall within the purview of this provision. At all events, it is manifest that it was not the intention of the

framers of this § 6 to exclude any sort or manner of causes from the jurisdiction of the superior court."

In *Filley v. Murphy*, 30 Wash. 1, 70 Pac. 107, it is said:

"In this state we have no probate court, properly speaking, as distinguished from the court that entertains jurisdiction of other matters. The court of general jurisdiction also hears and determines probate matters. Matters pertaining to probate are referred to what is called 'probate procedure,' as distinguished from what is denominated 'civil' or 'criminal procedure.' But when the court, sitting in a probate proceeding, discovers in a petition the statement of facts which forms the basis of a controversy, we see no reason why it may not settle the issues thereunder when an appearance has been made thereto, and then proceed to try it in a proper manner, as any other civil cause."

In *Reformed Presbyterian Church v. McMillan*, 31 Wash. 643, 72 Pac. 502, the latest and perhaps the strongest expression of the court is as follows:

"The constitution does not make the superior courts probate courts. On the contrary it vests the superior courts with jurisdiction 'of all matters of probate'; hence the court is not shorn of its general powers simply because the cause before it may be one which was cognizable formerly in a court of probate. It possesses in every case and at all times its powers as a court of superior and general jurisdiction, and among these is the power to hear and determine the question to whom a bequest made by a decedent rightfully belongs. A statute, therefore, can neither add to nor take away the power, and it is immaterial to inquire whether or not one conferring such a power is in existence."

Hence, the superior courts have this jurisdiction irrespective of any statute, and may exercise it as a matter of obvious necessity, by the application of equitable principles. This is well established.

In *Dodge v. Cole*, 97 Ill. 338, 37 Am. Rep. 111, the power of the court to exercise jurisdiction over the estates of incompetent persons was called in question. It was contended

"That upon the organization of our state government the state, as a political sovereignty, in its character of *parens*

*patriae*, succeeded to all the rights and duties previously enjoyed or exercised by the Crown of England with respect to idiots and lunatics and their estates. That the power to which the state thus succeeded is not of a judicial character, wherefore, in the distribution of the powers of government under the constitution, it was not thereby delegated to or conferred upon the judicial department of government, and hence, without express legislation, a court of chancery was not authorized to exercise it."

After an exhaustive discussion of the relative rights ·and limitations of the legislative and judicial branches of the government, the court came to the conclusion that the courts could, in the exercise of their general chancery jurisdiction, order a sale of real property of an incompetent under either one of the following equitable principles:

"(1)   The duty of the state to protect and provide for such of its citizens as are incapable of taking care of· themselves.  (2)   The right of every owner of property to have it applied to his support.  (3)   The absolute necessity for such relief.  (4)   Such applications involve the exercise of judicial power.  (5)   The duty which the state owes to those laboring under disabilities can be more appropriately and efficiently performed through courts of equity than in any other way."

All of which the learned writer of the opinion proceeds to discuss, saying in conclusion:

"All who are conversant with the history of equity jurisprudence know that as a distinct system, it has been of constant growth and development from its inception to the present time, covering a period of hundreds of years. The jurisdiction of a court of equity does not depend upon the mere accident whether the court has, in some previous case or at some distant period of time, granted relief under similar circumstances, but rather upon the necessities of mankind, and the great principles of natural justice, which are recognized by the courts as a part of the law of the land, and which are applicable alike to all conditions of society, all ages, and all people."

Without committing ourselves to the doctrine there announced, that a court might sell the property of an incompetent person for any purpose other than to relieve his immediate necessities and contribute to his comfortable support, the reasoning is conclusive upon the question of jurisdiction, and is sustained by the following authorities: *Allman v. Taylor*, 101 Ill. 185; *McCord v. Ochiltree*, 8 Blackf. (Ind.) 15; *Corrie's Case*, 2 Bland (Md. Ch.) 488; *Latham v. Wiswall*, 37 N. C. 294; *Dowell v. Jacks*, 58 N. C. 417; *Ashley v. Holman*, 15 S. C. 97; *Burke v. Wheaton*, Fed. Case, No. 2,164.

While there are cases holding that this special jurisdiction over the estates of incompetent persons does not come to us as inherent to the equitable jurisdiction of our courts, reference to our constitution, art. 4, § 6, as construed by the cases heretofore decided by this court, will show that jurisdiction is given "in all special cases and proceedings as are not otherwise provided for." This must include power over the estate of an incompetent when properly brought before the court, for the object of the people in establishing their courts and defining their jurisdictions was to safeguard and protect property rights. It is only where there is no general or plenary jurisdiction conferred upon the court by statute or constitution that the jurisdiction of the courts exercising power over the persons or estates of incompetents is to be considered limited or special. *Modawell v. Holmes*, 40 Ala. 391. To put the property of an incompetent to such uses as will tend to his relief and comfort should be one of the first duties of the court, or as is desired in this case, to use the funds on hand for the protection of his property and to finding the ward if possible. Under the general provisions of our constitution distinctions are preserved between the common law, equity, and probate practice, but it is for convenience, rather than because of the original reasons underlying the segregation of such courts under the English procedure. The power, then, being in the superior court, covering as it

does the functions of the common law courts, courts of equity and probate, the name of the particular jurisdiction is immaterial to our discussion so long as a procedure is provided to carry it into execution. This the legislature has undertaken to do in § 4 of the act of 1909, page 409 (Rem. & Bal. Code, § 1625).

Nor do we think that the jurisdiction depends upon the domicile of the incompetent. If it did, the humane purposes of the law might be defeated entirely. The first case in which this phase of the law is noticed is that of *Ex parte Southcote*, Amb. 110. Southcote was confined in an asylum in Belgium. He had property in England. Upon a petition to appoint a commission for his estate, which of course involved an inquiry *de lunatico*, Lord Hardwicke, who delivered the opinion, expressed some doubt as to the practice, but was convinced that he had power to issue a commission where the lunatic was a nonresident and had property within the jurisdiction of the court. In *In re Devausney*, 52 N. J. Eq. 502, 28 Atl. 459, a guardian was appointed for a nonresident ward. It was held that the court was not ousted of its jurisdiction to issue a commission because of the nonresidence of the incompetent. In this case it was held that the *Southcote* case "is an authority for issuing a commission when the alleged lunatic is nonresident, if he or she owns an estate within the jurisdiction." The court in the opinion mentioned reviews the English cases as well as the following American cases: *In re Perkins*, 2 Johns. Ch. 124; *Matter of Petit*, 2 Paige 174; *Matter of Ganse*, 9 Paige 416; *Matter of Fowler*, 2 Barb. Ch. 305. The only case we have found where the whereabouts of the incompetent was not known at the time of the petition was that of Ganse. Ganse had been a resident of the town of Fishkill, N. Y., and had considerable property at that place. He had become deranged and thereafter disappeared. His whereabouts was unknown to his friends at the time the application was made for guardianship. Upon the authority of the *Southcote* case, the commis-

sion issued, and the court took jurisdiction of his property.

It is next insisted that the court, in any event, had no power to appoint a nonresident as a guardian. It will be remembered that the statute, chapter 118, Laws of 1909, page 408 (Rem. & Bal. Code, § 1622 *et seq.*), provides for a guardian for the estate only. No reference is made to residential qualifications. The general rule, as we understand it to be, is that, in the absence of a statute, the court may appoint any fit and proper person if he be a resident or nonresident. His bond answers for his presence and, in theory at least, he is always before the court. While a court should not, and probably would not, have the power to appoint a nonresident guardian of the person of a resident incompetent, the manifest objections to such a procedure can have no application where it is the thing and not the person which is the subject of the court's intervention. Although in the absence of a statute a nonresident guardian for the person as well as the estate was sustained in *Berry v. Johnson*, 53 Me. 401, this authority may well be doubted in so far as it covers the person of the incompetent.

Other errors are assigned, but it seems to us that they all depend upon the power of the court to appoint a guardian for a nonresident ward, and not upon further construction of the statute, and, like respondent's objection to the capacity of the protestant to appear in this and the lower court, need no discussion.

Gose and Morris, JJ., concur.

Fullerton, J. (concurring)—In my opinion the statute affords ample authority for the action of the court, and I concur in the conclusions reached by the majority. On the question of the inherent power of the court to appoint a guardian under the circumstances recited, I express no opinion.

Rudkin, C. J. (dissenting)—I agree with the majority that our superior courts have jurisdiction to appoint guard-

ians for nonresident insane persons who have property in this state, but do not think that such jurisdiction should be exercised under the facts disclosed by this record. The person for whom a guardian has been appointed mysteriously disappeared more than a year and a half ago, and diligent search and inquiry throughout the entire Pacific Coast has failed to discover either him or his whereabouts. Under such circumstances, when we consider the state of his mind and the state of his health, the presumption of death is far stronger than the presumption of continued insanity. If dead, the order appointing the guardian is a nullity (*Scott v. McNeal*, 154 U. S. 34), and will afford no protection to third persons dealing with the alleged guardian. The court below has commissioned a nonresident of this state to demand and receive money from citizens of this state, when payment to the person thus commissioned will, in all human probability, constitute no acquittance of the debt. For this reason I dissent.

### On Petition for Rehearing.

[*En Banc.*   September 7, 1910.]

Per Curiam.—A petition for a rehearing has been filed in this cause, in which the appellant earnestly insists that the court below was without jurisdiction to appoint a guardian for the estate of a nonresident insane person. We adhere to the views expressed in our former opinion upon that question. But it might be inferred from the argument set forth in the petition that the guardian assumes that he has been appointed for all the estate of the insane person, wheresoever situated. This position is untenable. The jurisdiction of the courts of this state is limited to the property within its borders and, properly construed, the order appointing the guardian is likewise limited in its application.

The rehearing is denied.